V.E.                                          *        IN THE UNITED STATES
                                              *        DISTRICT COURT FOR
Plaintiff,                                    *        THE DISTRICT OF MARYLAND
                                              *        (Northern Division)
v.                                            *
                                              *
UNIVERSITY OF MARYLAND                        *        Case No. _____
BALTIMORE COUNTY, MARYLAND                    *
                                              *
SERVE ON:                                     *
Office of the Attorney General                *
c/o Catherine Bledsoe                         *
Civil Litigation Division                     *
200 Saint Paul Place                          *
Baltimore, Maryland 21202                     *
                                              *
Defendant.                                    *
                                              *
                                              *
*       *       *       *       *       *     *     *     *     *     *     *     *

## COMPLAINT

Plaintiff V.E.[1], by and through her undersigned attorneys, sues Defendant

University of Maryland, Baltimore County ("UMBC"), and in support, alleges the

following:

## Jurisdiction and Venue

1.      This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1331 because Plaintiff's statutory claim asserts a federal question over which

this Court has jurisdiction and Plaintiff asserts state-law claims over which this Court has

supplemental jurisdiction.

---

[1] Plaintiff's Motion to Proceed Under Pseudonym and File Under Seal will be filed when this case receives a case number.

2.     This Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1)(a) because Defendant is domiciled in and conducts business within this judicial district.

3.     Venue in this Court is proper pursuant to 28 U.S.C § 1391(b) because all of the acts, events and omissions that gave rise to the claims occurred in this judicial district.

<u>Parties</u>

4.     V.E. is a female graduate of UMBC's class of 2022 and a current Maryland resident. V.E. was a swimmer on UMBC's conference-winning Swimming and Diving Team from 2017 to 2022.

5.     Defendant University of Maryland Baltimore County, Maryland ("UMBC") is a higher education entity located at 1000 Hilltop Circle, Baltimore, Maryland 21250.

6.     UMBC receives Federal Financial Assistance as an educational institution.

<u>Factual Allegations</u>

7.     From 1997 to 2022 Chad Cradock was a coach, then Head Coach, for UMBC's Swimming and Diving Team.

8.     Cradock presided over numerous championships, records, and even coached students who competed in the Olympics.

9.     At the same time, faced with a growing investigation, Cradock resigned as Head Coach of UMBC's Swimming and Diving Team.[2]

---

[2] Cradock took his own life several days later.

10.     As a UMBC coach, Cradock exercised power on behalf of the University, over virtually every aspect of the swimmers' lives.

11.     Through Cradock and other coaches, UMBC controlled what the swimmers ate, where they slept, and when they practiced. UMBC further delegated to Cradock the power to enforce a strict code of conduct on the Swimming and Diving Team.

12.     UMBC gave Cradock power to decide what events students participated in, control their scholarship eligibility, revoke students' team membership, and their corresponding athletic scholarships.

13.     For UMBC swimmers, Cradock spoke for UMBC. His word was final.

14.     In 2016, UMBC began recruiting V.E. to enroll and compete as a distance swimmer on the Swimming and Diving Team.

15.     V.E accepted admission to UMBC with an athletic scholarship and began her collegiate career in the Fall of 2017.

16.     At the start of her freshman year, UMBC assigned V.E. to living quarters in a freshman dorm room that she shared with another female UMBC swim team member.

17.     J.W.,[3] another freshman who was also on the Swimming and Diving Team, lived two doors down the hall.

18.     During V.E.'s freshman year, she and J.W. began a romantic relationship, which quickly became violent.

19.     J.W. quickly began to exhibit dangerous behavior towards V.E.

---

[3] V.E. still fears J.W., and for that reason, J.W. is not publicly named.

3

20.    During this time, and for months thereafter, J.W. subjected V.E. to a prolonged, repeated, severe and pervasive pattern of sexual assault, relationship violence, sexual intimidation, and sexual harassment.[4]

21.    Specifically, J.W. regularly coerced V.E to have sex against her will, stalked her to and from her dorm room and classes, waited for her in a darkened room to scare and threaten her, sent innumerable messages through text messages and social media apps, and by threatening suicide in an attempt to control V.E.

22.    V.E., who was in the first adult relationship of her life, was terrified, alone, and helpless.

23.    J.W.'s abuse left V.E. with injuries to her vagina severe, that they required medical treatment.

24.    As the situation continued to deteriorate, V.E. tried to end the relationship with J.W., but her attempt to end the abuse enraged J.W., and his behavior worsened.

25.    V.E. first reported J.W.'s abuse to UMBC at a March 2018 meeting in Cradock's office.

26.    UMBC did nothing to protect V.E., despite having actual knowledge of the abuse.

27.    Upon receiving V.E.'s report, UMBC told V.E. that she, the victim, was responsible for her sexual assault and J.W.'s gender-based violence and intimidation.

---

[4] UMBC reached these conclusions in a May 2, 2022 report, titled Investigation Into Alleged Violations of Sexual Misconduct, Interpersonal Violence, and Other Related Misconduct Policy & Discrimination and Equal Opportunity Policy. The Report, prepared by the law firm Saul Ewing at UMBC's request, is 77 single-spaced pages long and has hundreds of pages of exhibits.

28.   UMBC demanded that V.E. conceal J.W.'s sexual, physical, and emotional abuse. UMBC told V.E. it "didn't want this to be a mess on the [UMBC swim] team."

29.   UMBC refused to discipline J.W., and did nothing to prevent his constant gender-motivated harassment of V.E.

30.   UMBC failed to advise V.E. of her rights, the availability of interim protective measures to keep her safe, or other reporting opportunities, such as the Baltimore County Police or the Title IX Office, as UMBC's policy requires.

31.   Despite V.E.'s numerous reports, UMBC intentionally refused to fulfill its statutory, common law, or contractual obligations to her.

32.   As a result of UMBC's inexcusable deliberate indifference, J.W. continued to sexually harass and abuse V.E.

33.   As a result, her academic and athletic performances suffered. V.E. became withdrawn and began to suffer psychological symptoms.

34.   The abuse continued, even after their dating relationship ended.

35.   J.W. continued coerce V.E. to submit to his sexual demands. He would threaten to harm himself or kill himself, and hit himself in V.E.'s presence, until he got his way.

36.   J.W. frequently sent V.E numerous, consecutive, and harassing text messages.  J.W. would frequently do so until the early hours of the morning, making it impossible for V.E. to study or practice the sport she had spent her life mastering.

37.   For example, in April 2018, over the course of a few days, J.W. sent V.E. over 200 text messages.

5

38.    Some of those texts included threats of violence.

39.    Another student – not the UMBC administration – finally alerted UMBC Police that J.W. was a threat to himself and others.

40.    UMBC Police were able to find J.W., and, after reviewing his text messages to V.E., responding officers transported J.W. to the hospital for an involuntary psychiatric evaluation.

41.    J.W.'s messages, reviewed in detail by UMBC Police, reflected unequivocal gender-based harassment and abuse of V.E.

42.    That same night, a UMBC Police officer filed a Petition for Emergency Evaluation  of J.W. The officer accurately testified that J.W. presented a danger to the life or safety of himself or others, presumably including V.E.

43.    V.E., and others, repeatedly told UMBC about J.W.'s gender-based abuse and harassment, and the effect it had on V.E's life and studies.

44.    V.E. informed UMBC that J.W.'s proximity to her dorm room was a serious threat to her safety.

45.    As a result of UMBC's inaction, V.E. was forced to move out of the dorm room she had rightfully earned to avoid further exposure to J.W.'s threats and intimidation.

46.    V.E. arrived at UMBC a world-class athlete and a model student.

47.    After less than a year at UMBC, V.E. was without a place to sleep or live, and was in constant fear of harm from J.W.

6

48.    Instead of taking advantage of the educational opportunities that had drawn her to UMBC, V.E. was forced to sleep on a friend's couch, in hiding, as if she were an escapee.

49.    UMBC knew that V.E. had nowhere to live safely, and did nothing.

50.    UMBC told V.E. to continue to live on her friend's couch because, according to UMBC, it was "safe."

51.    V.E.'s lack of safety, however, was a direct result of UMBC's disregard for V.E.'s rights as a woman, a student, an athlete, or even a person.

52.    V.E. again informed UMBC of J.W.'s still-occurring acts of violence and intimidation.

53.    V.E. specifically told UMBC that J.W. continued to send harassing messages, follow her, and threaten self-harm.

54.    Almost unbelievably, UMBC told V.E. to forward any messages from J.W. to her coach, and that her coach would ghostwrite her responses to her abuser.

55.    Instead of protecting V.E. from abuse, UMBC tried to appease her tormentor.

56.    UMBC's continued indifference to V.E., while she suffered J.W.'s violence, resulted in V.E. experiencing mental and emotional suffering.

57.    V.E. began to suffer constant, debilitating fear, stress, and anxiety that caused her to miss mandatory off-season training sessions and academic obligations.

58.    In response to V.E. missing training, UMBC, through Cradock, threatened to revoke her scholarship.

59.    UMBC/Cradock followed the threat with another: If V.E. reported to UMBC's Title IX office, things would "get worse" for her. He again instructed her to not report anything about J.W. to anyone and to ignore any potential inquiry from UMBC's Title IX office.

60.    V.E.'s grades, mental health, and physical well-being continued to suffer because of J.W.'s ongoing harassment and UMBC's indifference and refusal to take corrective action.

61.    J.W. continued to harass V.E. despite her requests that he stop. J.W.'s harassment included circumventing V.E.'s efforts to block his texts and attempts to contact her through apps and social media. J.W. repeatedly threatened to harm himself if she did not continue personal and social media contact with him.

62.    Because of UMBC's non-response to V.E.'s reports, J.W. was able to engage in a course of conduct that caused Plaintiff to fear for her immediate health and safety and suffer substantial emotional distress.

63.    The harassment did not stop. In one instance, J.W. physically chased Plaintiff across campus as she fled after seeing him. J.W. caught her in near some offices. There, he blocked her path. He then assaulted V.E. by grabbing her and shaking her while screaming at her.

64.    V.E. was so terrified of J.W. and what he would do to her, especially considering UMBC's non-response to her reports.[5]

---

[5] Cradock later told V.E. that he saw J.W. attack her. Despite this, UMBC did nothing to stop J.W.'s ongoing assault of V.E.

<u>UMBC Forces V.E. to "Mediate" with her Abuser</u>

65.     Cradock met with J.W. and V.E. separately. At her meeting, V.E. was crying uncontrollably. V.E. told Cradock she was "not ok." Cradock responded by laughing and forbid her from pursuing a Title XI Complaint.

66.     A few days after this public assault, Cradock called V.E. into his campus office without explanation.

67.     When she arrived, she was terrified to see J.W.

68.     Rather than follow its own Title IX protocol, UMBC forced V.E. to meet in person with J.W.

69.     Cradock forced V.E. to remain in his office when she attempted to leave.

70.     While J.W. punched the table, glared at V.E. and successfully intimidated her.

71.     On numerous other occasions, J.W. continued to stalk Plaintiff, by following her to her dormitory room; waiting for her in a dark room; and following her at UMBC-sponsored events.

72.     J.W's actions, and UMBC's refusal to do anything to correct them, led V.E. to fear for her safety and caused her grades to suffer substantially.

73.     V.E. suffered emotional distress, diminished health, exacerbated previously existing medical conditions, and decreased her ability to engage in athletic and educational activities.

74.     V.E.'s academic performance was so affected that she was sometimes unable to complete assignments and projects. Her ability to participate fully and perform in her athletic endeavors on the Swimming and Diving Team was also affected.

75.     Acting on behalf of UMBC, Cradock flatly told V.E. not to report the matter to UMBC's Title IX Coordinator.  According to UMBC, if V.E. did so, things would get worse for Plaintiff, her ability to practice on the swim team would be further prevented, it would hurt the team, and would make her look bad.

76.     In contrast, J.W. suffered no real consequences for his actions, and remained on the UMBC's Swimming and Diving Team, despite the fact that V.E. had credibly reported his physical and sexual assaults.

77.     No one at UMBC notified UMBC's then-Title IX Coordinator until June 24, 2018. On that date, Cradock sent a factually inaccurate memorandum and timeline entitled "Report" to Bobbie Hoye, Esquire, counsel for UMBC.

78.     Hoye sent V.E. an email regarding the "Report" but took no other action.

79.     UMBC created and fostered a hostile environment for Plaintiff when it failed take corrective actions as he was legally required to do.

80.     UMBC employees failed to timely report to the Title IX Coordinator. Cradock instead forced her into direct contact and other interactions with her abuser.

81.     For the remainder of her undergraduate career, V.E. was forced to see her abuser on campus daily, at swim team activities, in classes, and at her dormitory, until graduation.

## **CAUSES OF ACTION**

## COUNT I
### *Violation of 20 U.S.C. § 1681, et. seq.*
### *Title IX of the Education Amendments Act*

82.     All numbered paragraphs of this Complaint are incorporated by reference as if fully stated herein.

83.     UMBC exercised substantial control over the student who physically assaulted, sexually coerced, harassed, stalked, and discriminated against V.E. All the events giving rise to this claim occurred on UMBC's campus.

84.     The sexual coercion, discrimination and harassment V.E. suffered were sufficiently severe, pervasive, and objectively offensive that they barred her access to educational opportunities and benefits offered by UMBC.

85.     The acts and omissions of Cradock and other UMBC employees created a hostile educational environment for Plaintiff at UMBC.

86.     As the Head Coach for the Swimming and Diving Team, Cradock was the delegee of UMBC's authority to address known gender discrimination directed at V.E. by other UMBC students.

87.     Cradock was a "Responsible Employee," as defined by UMBC and was required to take action to address J.W.'s conduct and report the information he had about J.W.'s prohibited conduct to the Title IX Coordinator immediately.

88.     UMBC is liable for Cradock's failures as an institution, pursuant to Title IX's provisions.

89.     UMBC failed to inform Plaintiff of her rights and remedies as they related to the protections granted her by Title IX, but did not.

90.    V.E.'s report of sexual harassment and assault to Cradock constituted effective actual notice to UMBC and triggered a legal duty to act.

91.    UMBC thus had a duty to ac after learning of J.W.'s sexual coercion, discrimination and harassment of V.E.

92.    Despite UMBC's legal obligation to take action to redress the harassment, it did not.

93.    Cradock, acting for UMBC, treated V.E. complete and deliberate indifference. UMBC's response to known discrimination was clearly unreasonable and unlawful, considering the known circumstances.

94.    UMBC, even apart from Cradock's notorious and unforgivable acts discriminated against Plaintiff in violation of Title IX by allowing J.W. to subject Plaintiff to severe and pervasive sexual harassment that prevented her from accessing the educational opportunities UMBC provided.

95.    J.W.'s harassment was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff's access to an educational opportunity and benefit.

96.    UMBC's deliberate indifference, and willful bad acts, caused V.E. to suffer the sexual harassment and made her more vulnerable to it.

97.    UMBC's failure to investigate J.W.'s actions, impose discipline, or offer protective measures, was inconsistent with its own policies, and violated federal and state law.

98.    As a direct and proximate cause of UMBC's violation of Title IX, V.E. was forced to endure sexual harassment and denied access to a full UMBC education.

99.   UMBC's disregard for V.E.'s education resulted in V.E. being unable to reside in her assigned UMBC dorm; unable to study safely at the library; unable to walk on UMBC's campus without fearing for her safety; she was unable to participate in her sport without fear of physical or sexual violence.

100.   UMBC had an ill-motivated preference for J.W. over V.E. because of their respective genders.

101.   These deprivations undermined and detracted from Plaintiff's educational experience and effectively denied her equal access to UMBC's educational resources and opportunities.

102.   These deprivations were concrete, negative effects on Plaintiff's ability to participate in her educational program and athletic activities.

103.   These damages suffered by Plaintiff were a direct and proximate cause of UMBC's deliberate indifference to her rights under Title IX, and clearly unreasonable response to her plight.

104.   UMBC must be held accountable for its discrimination against V.E.

## COUNT TWO
### Breach of Contract

105.   All numbered paragraphs of this Complaint are incorporated by reference as if fully stated herein.

106.   V.E. and UMBC were contractually bound to each other during her enrollment.

107.   V.E. paid tuition, complied with UMBC's enrollment procedures and policies, and competed on the Swimming and Diving Team, as required by her athletic scholarship.

108.   V.E. complied with all terms of the contractual relationship.

109.   UMBC, however, breached the terms of its contractual relationship with V.E.

110.   UMBC's relevant Policy on Prohibited Sexual Misconduct, Interpersonal Violence, and Other Related Misconduct ("Policy") constituted a part of the contractual relationship between V.E. and UMBC, as the penalty for breaching the Policy included expulsion.

111.   The Policy sets forth how UMBC agreed to address reports of sexual misconduct, interpersonal violence, and other related misconduct. The Policy also enumerated V.E.'s procedural and substantive rights.

112.   The Policy reflects UMBC's contractual duty and legal responsibility to maintain a campus that is free from unaddressed sexual misconduct, interpersonal violence, and other related misconduct.

113.   Had UMBC honored it, the terms of the Policy protected V.E. from J.W.'s imposition upon her right to participate in UMBC's educational programs or activities and his threat to her health and safety.

114.   The Policy identified certain UMBC employees as "Responsible Employees," who were required to immediately share the known details of an incident of

Prohibited Conduct (date, time, location, names of parties involved, description of the incident) with the Title IX Coordinator.

115.  "Responsible Employees" included all University police employees and all UMBC athletic coaches.

116.  Cradock was a Responsible Employee.

117.  UMBC's contract with V.E. required that UMBC address, with the Title IX Coordinator's involvement, any known instances of J.W.'s prohibited conduct towards her.

118.  The Policy further states that any Responsible Employee who fails to make such a report is in violation of the policy.

119.  The UMBC Police failed to report J.W.'s violent and discriminatory text messages to V.E., as required by the Policy, and breached UMBC's contract with V.E.

120.  Cradock/UMBC failed to timely make a report of V.E.'s harassment, and breached UMBC's contract with V.E.

121.  Cradock/UMBC also instructed  V.E. to not cooperate with anyone if contacted, a direction violation of the Policy.

122.  The Policy provided that V.E. was entitled to request interim protective measures to ensure her safety and well-bring.

123.  V.E. , in fact, requested provisional or interim measures, and UMBC ignored them.

124.  The terms of the Policy set forth that UMBC would take appropriate, responsive, and prompt action to enforce Interim Protective Measures.

125.   It did not, despite V.E.'s requests.

126.   These failures were breaches of the contractual relationship, actual or implied, between V.E. and UMBC.

127.   These contractual breaches caused Plaintiff to suffer substantial emotional distress resulting in a Post-Traumatic Stress Disorder diagnosis, poor performance in her academic studies, poor grades, poor performance in her athletic endeavors, inability to reside in her UMBC dormitory, and ongoing emotional damages.

128.   V.E. did not receive the benefit of her bargain with UMBC, in that she paid for educational and other services that UMBC denied her access to.

129.   As she did not realize UMBC breached its contract, V.E. should be made whole.

## COUNT III
### *Grossly Negligent Supervision and Retention*

130.   Plaintiff incorporates and realleges all numbered paragraphs of this Complaint into this Count as if fully set forth herein.

131.   UMBC had a fiduciary relationship with Plaintiff as a student.

132.   As a Maryland educational institution, UMBC owed Plaintiff a special duty of trust and confidence to ensure her safety and well-being.

133.   UMBC, through its staff, breached their duty owed to Plaintiff by, among other things:

  a.   Failing to properly protect Plaintiff from sexual abuse and harassment;

  b.   Improperly protecting Plaintiff from sexual abuse and harassment;

16

    c.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and discrimination of its female student by its male student;

    d.  Ignoring and failing to properly address complaints about numerous instances of sexual harassment and gender discrimination on its campus; and

    e.  Failing to supervise, monitor, and/or train staff to handle reports of sexual harassment, coercion, assault, and stalking appropriately and adequately.

134.   In retaining Cradock, a known bad actor, UMBC knew that it had created a danger for V.E. to be sexually harassed, coerced, assaulted, and stalked, but concealed this from V.E.

135.   UMBC also knew that Cradock was non-compliant with policy and state and federal law.

136.   UMBC wantonly and recklessly failed to supervise its students, administrators, instructors, and coaching staff, even after specific complaints of sexual harassment, coercion, assault and stalking had been lodged against them by Plaintiff.

137.   UMBC's conduct was wanton, malicious, intentionally discriminatory and oppressive because UMBC disregarded and exhibited reckless indifference to the foreseeable risks of harm to V.E.

138.   UMBC acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power, in that it preferred to protect J.W. from consequences of his harassment, instead of V.E.

139.   UMBC's gross negligence caused Plaintiff to experience, severe emotional distress accompanied by physical manifestations, such as nausea, nightmares, anxiety, and inability to sleep, among others.

140.   As a direct and proximate result of UMBC's gross negligence, V.E. sustained serious injuries, had to undergo treatment and medical care, incurred medical expenses, incurred lost wages, lost time from her daily pursuits, and lost the ability to function normally.

## COUNT IV
### *Gross Negligence*

141.   Plaintiff incorporates and realleges all numbered paragraphs of this Complaint into this Count as if fully set forth herein.

142.   UMBC entered into a relationship with V.E. that imposed on it a duty of reasonable care and a duty to protect V.E. from reasonably foreseeable harm.

143.   UMBC breached their duty owed to V.E. by maliciously, or with reckless disregard:

   a.  Failing to properly protect V.E. from sexual abuse and gender-based harassment in order to benefit J.W. and Cradock;

   b.  Improperly protecting V.E. from sexual abuse and gender-based harassment;

   c.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and gender-based discrimination of its female student by its male student;

18

    d.   Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual harassment, sexual coercion, sexual assault, and stalking occurring on its campus;

    e.   Failing to promptly report V.E.'s sexual harassment, coercion, assault and stalking to the proper authorities; and

    f.   Failing to supervise, monitor, or train staff to handle reports of sexual harassment, coercion, assault, and stalking appropriately and adequately.

144.   UMBC knew or should have known that it had created an opportunity for V.E. to be sexually coerced, harassed, assaulted, and stalked.

145.   UMBC's actions, and omissions proximately caused V.E.'s injuries.

146.   UMBC's malice, gross negligence, and reckless disregard include Cradock's actions as the Head Coach for the UMBC Swimming and Diving Team.  His malicious and grossly negligent acts were committed on UMBC's behalf, likely at its directions, and for UMBC's benefit, while he was performing services for which he was engaged.

147.   Cradock acted in furtherance of UMBC's interests and with UMBC approval, as evidenced by his order the V.E. remain silent regarding her experience of sexual harassment and abuse to protect J.W. and UMBC's Swimming and Diving team.

148.   UMBC is liable for Cradock's malicious, grossly negligent, and recklessly indifferent actions and inactions.

149.   UMBC's conduct was wanton, malicious, and oppressive because UMBC disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, bad motive, and the intent to abuse its power for its own benefit.

150.   As a direct and proximate cause of UMBC's gross negligence, V.E. has experienced, and will continue to experience, severe emotional distress accompanied by physical manifestations, such as nausea, nightmares, anxiety, and inability to sleep, among others.

151.   As a direct and proximate result of UMBC's gross negligence, V.E. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally.

## COUNT V
### Intentional Infliction of Emotional Distress

152.   UMBC, through its staff, intentionally allowed V.E. to be sexually harassed, discriminated against, assaulted and stalked.

153.   UMBC's conduct in harming V.E.'s well-being, to benefit Cradock and J.W., was extreme and outrageous and V.E. severe emotional distress.

154.   UMBC's conduct – allowing J.W. to assault and abuse V.E. – was so outrageous and so extreme in degree, that it exceeds the bounds of human decency, is atrocious, and is utterly intolerable in a civilized community.

155.   UMBC purposefully intended to cause, or recklessly disregarded the high probability of causing, a disturbance of Plaintiff's emotional tranquility for the benefit of Cradock and J.W., who UMBC favored over V.E.

156.   As a direct and proximate result of UMBC's outrageous conduct, V.E. sustained serious injuries, had to undergo treatment and medical care, to incur medical

expenses, incur lost wages, to lose time from her daily pursuits, and to lose the ability to function normally.

WHEREFORE Plaintiff V.E. requests judgment be entered in her favor against Defendant University of Maryland Baltimore County as follows:

A.  Compensatory damages in excess of $75,000;

B.  Statutory interest;

C.  Costs; and,

D.  Reasonable attorney's fees.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial on all counts so triable.

Dated: September 14, 2022                   /s/ Rignal W. Baldwin V

Rignal W. Baldwin V

Federal Bar No.: 30136

Baldwin | Seraina, LLC

111 South Calvert Street, Suite 1805

Baltimore, Maryland 21202

Telephone (410) 385-5695

Facsimile (443) 703-7772

rbaldwinv@baldwin-seraina.com